Filed 11/26/25  Anaya v. Kia Motors America CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SALVADOR ANAYA,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>KIA MOTORS AMERICA, INC.,<br><br>Defendant and Respondent. | B324098<br><br>(Los Angeles County<br>Super. Ct. No. 19STCV13337) |

APPEAL from a judgment of the Superior Court, Los Angeles County, Yolanda Orozco, Judge.  Affirmed.

Knight Law Group, Roger Kirnos; Greines, Martin Stein & Richland, Cynthia E. Tobisman, Gary J. Wax, and Joseph V. Bui, for Plaintiff and Appellant.

SJL Law, Julian G. Senior, Sinyun Yao, Marcelo Lee; Horvitz & Levy, Lisa Perrochet, Shane McKenzie, and Jeffrey Vides, for Defendant and Respondent.

————————————

Plaintiff Salvador Anaya leased a 2016 Kia Sorento that suffered engine failure about two and a half years into the lease. Anaya took the Sorento to a dealership for warranty repairs. The dealership repaired the car, but it took 111 days to do so. Anaya refused to pick up the Sorento and filed a lawsuit against defendant Kia Motors America, Inc. (KMA). KMA was not a party to the lease, but it provided the warranty on the Sorento. Anaya asserted claims against KMA for fraud, breach of implied and express warranties, and untimely repair in violation of the Song-Beverly Consumer Warranty Act (Song-Beverly Act). In relief, Anaya sought reimbursement of the entire amount he paid under the lease.

The trial court granted summary adjudication for KMA on Anaya's fraud and warranty claims. The parties tried the untimely repair claim to a jury. The trial court granted a directed verdict for KMA, concluding Anaya failed to show damages caused by the untimely repair.

Anaya contends the trial court erred by granting summary adjudication and the directed verdict in KMA's favor. According to Anaya, the court's rulings were premised on misunderstandings of the law. We agree with Anaya that some of the court's reasoning was flawed. However, we review the court's rulings, not its reasoning. Because the court's rulings were correct, we affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.      The lease and engine problems**

In September 2015, Salvador Anaya leased a new 2016 Kia Sorento from Kia of Downtown Los Angeles (the Dealership), an independent dealer. The lease term was four years. Anaya could

terminate the lease at any time by returning the Sorento to the Dealership and paying early termination charges.

KMA was not a party to the lease. It was the "distributor" of the Sorento, standing between the manufacturer and the Dealership. It also provided an express warranty for the Sorento and agreed to reimburse the Dealership for any warranty repairs it made.

The Sorento initially performed as expected, and Anaya thought it "work[ed] very well." But a year into the lease—around September 2016—the vehicle began experiencing engine problems. It had difficulty starting, did not accelerate properly, and completely stalled on the freeway during Anaya's pre-dawn commute. Despite those issues, Anaya continued driving the Sorento and making lease payments.

## B.    Engine failure and repair

In May 2018, the Sorento's engine completely failed. Anaya had it towed to the Dealership, where a service technician determined the engine "seized" due to "rod bearing failure." Essentially, the engine's internal components had broken down and locked up, rendering it inoperable.

Neither Anaya nor the Dealership alerted KMA to the problem with the Sorento's engine. At some point, however, KMA received a notification that the Dealership had ordered parts for the repair on a "rush" basis. After receiving the notification, KMA called Anaya six times and left voicemails for him. According to a KMA consumer affairs manager, KMA contacted Anaya to see if he needed alternative transportation while the Sorento was being repaired, and KMA would have reimbursed him for any out-of-pocket expenses he incurred during that time. Anaya never responded to KMA's calls.

3

On July 5, 2018—while the Sorento was still at the Dealership for repairs—KMA received an electronic communication through its website, which the parties refer to as the "web note." The web note purported to be sent by Anaya. Its message—which was written in Spanish—read, "I think I have a lemon and I want my money returned to me." KMA called the phone number listed on the web note and left a voicemail, but no one returned the call.

The Dealership replaced the Sorento's engine, starter block, and manifold. It completed the repairs on August 28, 2018—111 days after Anaya had it towed to the Dealership. The Dealership told Anaya the car was ready, but he refused to pick it up. Anaya claimed he was "really scared" to drive it and no longer had confidence in its reliability. About this time, Anaya stopped making payments on the lease.

## C. Litigation

In April 2019, Anaya filed a complaint against KMA asserting five causes of action: (1) breach of express warranty in violation of Civil Code section 1793.2, subdivision (d)[1]; (2) breach of implied warranty of merchantability in violation of section 1792; (3) violation of the Song-Beverly Act's 30-day repair requirement (§ 1793.2, subd. (b), the 30-day rule); (4) fraudulent concealment; and (5) intentional misrepresentation. Anaya alleged KMA is the "American sales, marketing, and distribution arm of Kia Motors Corporation," which he alleged is "a South Korean corporation." He also alleged KMA is "a 'manufacturer' and/or 'distributor' " under the Song-Beverly Act.

---

[1] Unless otherwise noted, undesignated statutory references are to the Civil Code.

4

In support of his fraud claims, Anaya alleged KMA was aware as early as 2009 that the engine installed in Sorentos—the Theta II engine—is defective. The Theta II engine defect allegedly causes the type of engine failure that Anaya's Sorento experienced in May 2018. Anaya alleged he was not aware of the defect when he leased the Sorento because KMA hid it from consumers and made false representations in its marketing materials.

In support of his other claims, Anaya alleged KMA breached express and implied warranty obligations and the 30-day rule by failing timely to repair the Sorento's engine defect. Anaya alleged he "is entitled to justifiably revoke acceptance" of the Sorento as a result of the violations and "hereby revokes acceptance of the vehicle." Among other forms of relief, Anaya sought rescission of the lease, restitution of any monies paid under it, cover damages, incidental and consequential damages, and punitive damages.

KMA filed a motion for summary adjudication challenging every claim except the claim for violation of the 30-day rule. The trial court granted the motion, summarily adjudicating Anaya's claims for breach of warranty and fraud, as well as his request for punitive damages. The court concluded KMA did not violate section 1793.2, subdivision (d), KMA had no implied warranty obligations under section 1792, and the economic loss rule barred Anaya's fraud claims.

The court conducted a jury trial on Anaya's sole remaining claim for violation of the 30-day rule. After the parties presented their evidence—but before submitting the case to the jury—the court granted a directed verdict for KMA. The court concluded

Anaya failed to show damages caused by the 30-day rule violation.

Anaya timely appealed.

## DISCUSSION

### I. Directed verdict

Anaya contends the trial court erred by granting a directed verdict for KMA on his claim for violation of the 30-day rule (§ 1793.2, subd. (b)). According to Anaya, the trial court relied on an erroneous interpretation of section 1794 to conclude he failed to show damages. Anaya argues the jury reasonably could have found he justifiably revoked acceptance of the Sorento in response to the 30-day violation, which would have entitled him to restitution and other forms of relief under section 1794.

#### A. Standard of review

A trial court may grant a directed verdict " ' " 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled [and] indulging in every legitimate inference which may be drawn from that evidence, . . . there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' " [Citations.]' " (*North Counties Engineering, Inc. v. State Farm General Ins. Co.* (2014) 224 Cal.App.4th 902, 919, quoting *In re Estate of Lances* (1932) 216 Cal. 397, 400.)

We review de novo orders granting a directed verdict. (*Camacho v. JLG Industries Inc.* (2023) 93 Cal.App.5th 809, 815.) In doing so, we "view the evidence in the light most favorable to the plaintiff, resolve all conflicts in the evidence and draw all inferences in the plaintiff's favor, and disregard conflicting evidence." (*Guillory v. Hill* (2015) 233 Cal.App.4th 240, 249.) We may affirm a directed verdict only if, " 'as a matter of law, no

6

other reasonable conclusion is legally deducible from the evidence.' " (*Camacho*, at p. 816.)

### B.     Trial court proceedings

After both parties rested at trial, KMA moved for a directed verdict on the ground that Anaya failed to submit sufficient evidence of damages caused by its violation of the 30-day rule.[2] KMA argued Anaya was entitled only to incidental and consequential damages under section 1794, subdivision (b)(2) (section 1794(b)(2)), but he presented no evidence of either.

Anaya did not contest that he failed to present evidence of incidental or consequential damages.  However, he argued the jury could award him restitution under section 1794, subdivision (b)(1) (section 1794(b)(1)) based on evidence showing he "justifiably revoked" acceptance of the Sorento.

KMA responded that Anaya presented insufficient evidence showing he justifiably revoked acceptance.  According to KMA, the only arguable revocation occurred after the repairs were complete.  KMA asserted that attempt to revoke was both untimely and directed at the wrong party.

The court did not consider whether there was sufficient evidence that Anaya justifiably revoked acceptance.  Instead, the court granted a directed verdict on a ground KMA did not raise.  According to the court, a plaintiff may recover damages under section 1794 only if he proves there were multiple unsuccessful repair attempts under section 1793.2, subdivision (d) (section 1793.2(d)).  Because Anaya failed to present evidence of multiple

---

[2]     KMA referred to the motion as a motion for nonsuit.  On appeal, however, the parties agree that it was a motion for directed verdict.

7

repair attempts, the court reasoned, he is not entitled to any damages under section 1794.[3]

### C. The trial court misinterpreted section 1794

The Song-Beverly Act " 'regulates warranty terms, imposes service and repair obligations on manufacturers, distributors, and retailers who make express warranties, requires disclosure of specified information in express warranties, and broadens a buyer's remedies to include costs, attorney's fees, and civil penalties. [Citations.] It supplements, rather than supersedes, the provisions of the California Uniform Commercial Code.' " (*Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 989–990.) As relevant to this case, the Song-Beverly Act's 30-day rule requires express warranty repairs be completed within 30 days. (§ 1793.2, subd. (b).)

Section 1794 provides the remedies available to a buyer[4] "damaged by a failure to comply with any obligation" under the Song-Beverly Act or "under an implied or express warranty or service contract." (§ 1794, subd. (a).) Section 1794, subdivision (b) (section 1794(b)) states, in pertinent part:

"(b) The measure of the buyer's damages in an action under this section shall include the rights of replacement or reimbursement as set forth in subdivision (d) of Section 1793.2, and the following:

---

[3] The court suggested Anaya might be entitled to damages under a breach of contract theory. However, the court found he failed to present evidence of direct damages caused by the 30-day rule violation.

[4] A lessee of a consumer good generally has the same rights under the Song-Beverly Act as a buyer. (See § 1795.4.)

8

"(1) Where the buyer has rightfully rejected or justifiably revoked acceptance of the goods or has exercised any right to cancel the sale, Sections 2711, 2712, and 2713 of the Commercial Code shall apply.

"(2) Where the buyer has accepted the goods, Sections 2714 and 2715 of the Commercial Code shall apply . . . ."

Accordingly, section 1794(b) contains three separate provisions concerning the remedies a buyer may pursue for violations of the Song-Beverly Act, including violations of the 30-day rule.  First, section 1794(b) states a buyer is entitled to the "right[] of replacement or reimbursement as set forth in subdivision (d) of Section 1793.2." (§ 1794, subd. (b).)  Section 1793.2(d), in turn, requires the buyer to show the manufacturer or its representative did not "service or repair the goods to conform to the applicable express warranties" despite "a reasonable number of attempts" to do so.  (§ 1793.2, subd. (d).) Therefore, to be entitled to the "right of replacement or reimbursement" under section 1794(b), the buyer must show multiple unsuccessful repair attempts.

Second, section 1794(b)(1) states a buyer who "has rightfully rejected or justifiably revoked acceptance of the goods or has exercised any right to cancel the sale" is entitled to relief under Commercial Code sections 2711, 2712, and 2713. (§ 1794, subd. (b)(1).)  As relevant to this case, Commercial Code section 2711 allows a buyer to cancel the sale and recover the price paid. (Cal. U. Com. Code, § 2711, subd. (1).)

Third, section 1794(b)(2) states a buyer who has "accepted the goods" is entitled to relief under Commercial Code sections 2714 and 2715.  Those provisions allow a buyer to recover, among

9

other relief, incidental and consequential damages. (See Cal. U. Com. Code, § 2715.)

In granting a directed verdict for KMA, the trial court seemed to believe a consumer is not entitled to damages under the second and third categories—those found in section 1794(b)(1) and (b)(2)—unless he is entitled to the "rights of replacement or reimbursement as set forth" in section 1793.2(d). (§ 1794, subd. (b).) The parties seem to agree, as do we, that the trial court's interpretation of section 1794 was erroneous. Section 1794(b) states a buyer's damages for a violation of the Song-Beverly Act "shall *include* the rights of replacement or reimbursement as set forth in subdivision (d) of Section 1793.2, *and the following*." (Italics added.) It goes on to list the damages available under section 1794(b)(1) and (b)(2). This language reflects a legislative intent that the remedies be independent of one another and cumulative. In other words, consumers may seek remedies under any and all provisions that fit their circumstances. Accordingly, a buyer need not satisfy the conditions under section 1793.2(d) in order to pursue remedies under section 1794(b)(1) and (b)(2).

Our interpretation is consistent with the Song-Beverly Act's purpose, which is to address the difficulties consumers face in enforcing warranties, including "the inconvenience of having to return goods to the manufacturer for repairs and . . . repeated unsuccessful attempts to remedy the problem." (*Cummins, Inc. v. Superior Court* (2005) 36 Cal.4th 478, 484.) In contrast, the trial court's interpretation would lead to absurd results. Section 1794 provides the measure of damages for "[a]ny buyer of consumer goods who is damaged by a failure to comply with any obligation under this chapter or under an implied or express warranty or service contract." (§ 1794, subd. (a).) According to the trial court,

10

to be entitled to damages under section 1794, the buyer first must establish all the requirements for relief under section 1793.2(d). Section 1793.2(d), however, applies only to express warranties. (See *Gavaldon v. DaimlerChrysler Corp.* (2004) 32 Cal.4th 1246, 1259 (*Gavaldon*).) Therefore, under the trial court's interpretation, buyers to whom section 1794 expressly applies—those injured by breaches of implied warranties and services contracts—could not recover any damages. That plainly was not the Legislature's intent.

**D.     Anaya failed to present sufficient evidence of damages**

Although we agree with Anaya that the trial court misinterpreted section 1794(b), we review the trial court's ruling, not its reasoning. (*Woods v. Union Pacific Railroad Co.* (2008) 162 Cal.App.4th 571, 576.) Accordingly, we must affirm if there were any grounds justifying a directed verdict in KMA's favor. (See *ibid.*)

KMA contends the trial court's ruling was correct because Anaya failed to show he suffered any damages as a result of the 30-day rule violation. It argues Anaya is not entitled to relief under section 1794(b) because he presented no evidence of multiple unsuccessful repair attempts; he is not entitled to relief under section 1794(b)(1) because he presented insufficient evidence that he "rightfully rejected or justifiably revoked acceptance of the goods or has exercised any right to cancel the sale"; and he is not entitled to relief under section 1794(b)(2) because he presented no evidence of consequential or incidental damages.

Anaya does not contest that he failed to present sufficient evidence of damages under section 1794(b) or (b)(2). However, he

11

contends he presented sufficient evidence from which the jury could have found he justifiably revoked acceptance of the Sorento. Therefore, he argues, the jury could have awarded him damages under section 1794(b)(1), including reimbursement of the entire amount he paid on the lease, any amounts still due under the lease, registration fees, insurance payments, and monthly payments on a new car.

According to Anaya, the jury reasonably could have found he satisfied all the requirements for revocation under Commercial Code section 2608 (section 2608). Section 2608 states, in relevant part:

"(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it

"(a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

"(b) Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

"(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it." (Cal. U. Com. Code, § 2608.)[5]

---

[5] It is not clear that this case is governed by section 2608. That provision appears in Division 2 of the Commercial Code, which covers the sale of goods. (See Cal. U. Com. Code, § 2101 et seq.) However, Anaya did not buy the Sorento. Rather, he leased it.

In opposition to KMA's motion for a directed verdict, Anaya argued he revoked acceptance three ways: (1) by asking the Dealership for a new car while the Sorento was being repaired; (2) by sending KMA a "web note" asking for his money back; and (3) by refusing to pick up the car after repairs were complete. On appeal, Anaya proposes two other ways he revoked acceptance: (1) by asking the Dealership to "change the car" during a service visit before the car broke down; and (2) by filing the complaint in this case. We consider each in turn.

1. *The service visit*

Anaya contends the jury could have found he first revoked acceptance during a service visit sometime before the Sorento broke down. Anaya presented very little evidence at trial concerning this event. He testified that the Sorento "started failing" at some point and he took it to the Dealership for service. At the Dealership, Anaya asked "if they could change the car that it wasn't working well," but they refused. According to Anaya, "they told [him] that they couldn't change" or "do that work."

---

Division 10 of the Commercial Code "applies to any transaction, regardless of form, that creates a lease," including " '[c]onsumer lease[s].' " (Cal. U. Com. Code, §§ 10102, subd. (a), 10103, subd. (a)(5).) Division 10 contains a provision—Commercial Code section 10517 (section 10517)—governing revocation of acceptance of goods under a lease. Section 10517 generally mirrors section 2608, but it substitutes "lessee" for "buyer," and "lessor" for "seller." (See Cal. U. Com. Code, § 10517.)

For the sake of simplicity, we will assume section 2608 applies. However, our analysis applies equally to section 10517, and we would reach the same conclusions under that provision.

13

Anaya proposed this theory of revocation for the first time in his reply brief on appeal. He did not raise it in the trial court. Nor did he meaningfully discuss it in his opening brief on appeal. Anaya's failure to do so forfeits the issue. (See *Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874 [a plaintiff may not raise new theories on appeal]; *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11 ["Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant"].)

In any event, no reasonable juror could have concluded Anaya revoked acceptance during the service visit. As best we can tell, Anaya's contention is that he revoked acceptance when he asked the Dealership to "change the car." However, Anaya did not specifically testify that he intended those words to revoke acceptance. Nor is such an intent self-evident.

Even if the phrase "change the car" could reasonably be interpreted to be a notice of revocation, Anaya's actions after the service visit clearly demonstrate that was not his actual intent. The undisputed evidence shows, after the service visit, Anaya continued to drive the car and treat it as his own. When the car subsequently broke down, he had it towed to the Dealership for repairs. According to Anaya, he checked on the status of the repairs several times, both in person and over the phone. He also requested a "loaner" car to use while the Sorento was being repaired. These actions are wholly inconsistent with Anaya's claim in his reply brief that he revoked acceptance during the service visit. (See Cal. U. Com. Code, §§ 2608, subd. (3) [buyer who revokes acceptance has same duties with regard to the goods as though he had rejected them], 2602, subd. (2)(a) ["[a]fter rejection any exercise of ownership by the buyer . . . is

14

wrongful"].) On this record, no reasonable juror could have concluded Anaya revoked acceptance at the service visit.

### 2. *Request for "another car"*

In the trial court, Anaya asserted he revoked acceptance from the Dealership sometime after the car broke down but before repairs were complete. Like the service visit, Anaya presented scant evidence at trial concerning this purported revocation. Anaya testified that he went to the Dealership around three times while the car was being repaired. During one of those visits, he "tried to get them to give me another car there but they told me that they couldn't change it." Anaya's son testified that he went with Anaya to the Dealership "around two times." During one of those visits, the son "ask[ed] [the Dealership] for a new car."[6]

Like Anaya's request to "change the car," his request for a "another car" does not clearly and unequivocally reflect an intent to revoke acceptance. Nor did Anaya testify that he intended to revoke acceptance at that time. No reasonable juror could have found Anaya revoked acceptance by requesting "another car" from some unidentified person at the Dealership.

---

[6] The son did not testify that he made the request at Anaya's direction. However, we will assume, for the sake of argument, that he did. Moreover, for the sake of simplicity, we do not differentiate between Anaya's request for "another car" and his son's request for a "new car." We refer to both, jointly, as Anaya's request for "another car."

15

### 3. *The web note*

Anaya contends, even if he failed to revoke acceptance directly from the Dealership, he revoked acceptance by sending KMA the web note. KMA received the web note on July 5, 2018, which was after the Sorento had been in the shop for 30 days, but before the Dealership completed the repairs. Therefore, Anaya argues, the web note was a timely revocation under section 2608, subdivision (1)(a).

Contrary to Anaya's contentions, no reasonable juror could have concluded the web note was a valid and timely revocation. As a foundational matter, Anaya failed to present sufficient evidence showing he created the web note. Despite its centrality to his arguments on appeal, Anaya presented no evidence of the web note during his case-in-chief. Nor did he mention it in his trial brief or opening statement.

Instead, Mandyjay Lewis—who works for KMA and testified in its defense—was the first witness to mention the web note at trial. In response to KMA's questions, Lewis explained that KMA received the web note via a contact form on its website. Lewis did not know who drafted or submitted the web note, a point Anaya's counsel confirmed during cross-examination.

KMA also introduced into evidence an internal customer service report, which purported to contain the substance of the web note. Based on that report, whomever drafted the web note included Anaya's first and last name, the VIN number of the Sorento, and a phone number. The web note's title, written in English, was "Buy Back." The body of the message—originally written in Spanish—read: "I think I have a lemon and I want my money returned to me."

16

Anaya suggests this evidence—all of which KMA presented—was sufficient to prove he sent the web note. We disagree. The fact that the web note included Anaya's name and contact information may have provided circumstantial evidence that he created it. (See *Hart v. Keenan Properties, Inc.* (2020) 9 Cal.5th 442, 449 [invoice for a pipe bearing a company's name and logo was circumstantial evidence that the company manufactured the pipe].) However, when considered with the other undisputed evidence Anaya presented to the jury, it was insufficient to prove that fact without resorting to speculation.

Although Anaya did not present any evidence of the web note during his case-in-chief, it seems his counsel tried to elicit testimony about it. While Anaya was on the stand, counsel asked him "Did you ever fill out any e-mails or anything asking for a new car? Do you remember filling out anything?" Anaya responded, "No, because I don't know how to write. Honestly, I don't know how to write." Counsel asked Anaya if he could write in Spanish, to which Anaya replied with a non-sequitur: "[B]ack at that time, I didn't use my cell phone much because I didn't know how to." Counsel asked, "Did you ever leave an e-mail that said anything about asking for a new car?" Anaya answered, "No." Counsel then asked, "Do you know if anyone in your family did?" Anaya replied, "No, not that either."

On redirect, Anaya testified that he does not own a computer and does not "know how to use" a computer. Anaya also recited his cell and work phone numbers, neither of which matched the phone number included in the web note. Anaya said he had the same cell phone number in 2018 and "many years" before that.

17

Viewing all the evidence in the light most favorable to Anaya, no reasonable juror could have concluded Anaya met his burden to prove he created the web note. Anaya repeatedly denied sending any electronic communications or knowing whether someone else in his family did so. In fact, he admitted he did not know how to write, use a computer, or use a phone at that time. Even if Anaya meant only that he could not write in English, it still would not explain the fact that the web note's title was written in English.

While it might be possible to reconcile Anaya's testimony with his current claim that he created the web note—for example, if Anaya simply forgot that a relative wrote and submitted the note at his direction—it requires baseless speculation to do so. On this record, no reasonable juror could have found, by a preponderance of the evidence, that Anaya created the web note. (See Evid. Code, § 115.)

Anaya maintains his testimony is not fatal to his claim because, although he denied filling out "emails or anything asking for a new car," he never explicitly denied sending a note via KMA's website requesting his money back. While true, counsel's questions were broad enough that it was reasonable to expect Anaya to mention the web note in response to them. In any event, whether Anaya created the web note was a matter entirely within his personal knowledge. Therefore, if he were responsible for the web note, it is reasonable to expect he would have testified to that fact. That Anaya provided no testimony, whatsoever, concerning the web note is itself compelling evidence that he did not create it. (See Evid. Code, § 412 ["If weaker and less satisfactory evidence is offered when it was within the power

of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust"].)

Even if Anaya had presented sufficient evidence showing he created the web note, the undisputed evidence shows he directed it at the wrong party.[7]  Revocation under section 2608 is not effective until "the buyer notifies the seller of it."  (Cal. U. Com. Code, § 2608, subd. (2).)  The Commercial Code defines a seller as "a person who sells or contracts to sell goods" (*id*. § 2103, subd. (d)), and "sale" as "the passing of title from the seller to the buyer for a price" (Cal. U. Com. Code, § 2106, subd. (1)).

Therefore, under the plain language of section 2608, Anaya had to notify the "seller" of the revocation for it to be effective. Anaya does not dispute that KMA was not the seller of the Sorento.  The undisputed evidence shows the Dealership—which is independent of KMA—leased the Sorento to Anaya and delivered the car to him.  KMA was not a party to that transaction, and Anaya did not accept the Sorento from it.  As KMA's counsel aptly observed in the trial court, "How do you revoke a transaction that you never entered into?"  Because KMA was not the seller, the web note was not an effective revocation of Anaya's acceptance of the Sorento.[8]  (See *In re Toyota Motor*

---

[7]     KMA raised this issue in its respondent's brief, but Anaya did not address it in his reply brief.

[8]     We would reach the same conclusion under section 10517, which states revocation is not effective "until the lessee notifies the lessor."  (Cal. U. Com. Code, § 10517, subd. (d).)  The Commercial Code defines a "lessor" as "a person who transfers the right to possession and use of goods under a lease."  (*Id*.,

19

*Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation* (C.D. Cal. 2010) 754 F.Supp.2d 1145, 1187 [California law requires a buyer to notify the direct seller to revoke acceptance]; see also *Seekings v. Jimmy GMC of Tucson, Inc.* (1981) 130 Ariz. 596, 600 [Uniform Commercial Code does not allow revocation from a non-seller manufacturer]; but see *Durfee v. Rod Baxter Imports, Inc.* (Minn. 1977) 262 N.W.2d 349, 357–358 [where retail seller was insolvent, buyer could revoke acceptance from distributor].)

### 4. *Refusal to pick up the Sorento and the complaint*

Finally, Anaya argues he revoked acceptance twice after the repairs were complete—first, by refusing to pick up the Sorento, and second, by filing the complaint in this case.

Both attempts to revoke were ineffective because Anaya made them after KMA completed the repairs.[9] Anaya suggests the fact that KMA repaired the Sorento is irrelevant because he revoked acceptance based on KMA's violation of the 30-day rule, not based on the engine defect. Therefore, he suggests, the fact

---

§ 10103, subd. (a)(16).) It is undisputed that KMA was not the lessor of the Sorento.

[9] These attempts at revocation fail for other reasons as well. Like Anaya's other requests directed at the Dealership, his refusal to pick up the Sorento did not clearly and unequivocally reflect an intent to revoke acceptance. The complaint, in contrast, was clear and unequivocal. However, like the web note, Anaya directed it exclusively at KMA. Because KMA was not the "seller," the complaint was not an effective revocation. (See Cal. U. Com. Code, § 2608, subd. (2); see also *id.*, § 10517, subd. (d).)

20

that Anaya cured the defect did not eliminate the grounds for revocation.

At the outset, we reject any suggestion that a violation of the 30-day rule alone provides grounds for revocation. The Song-Beverly Act does not state revocation is permitted in response to a 30-day rule violation. Instead, it merely states certain damages are available for a violation of the 30-day rule if the buyer has justifiably revoked acceptance. (See § 1794, subd. (b)(1).) To revoke acceptance, the buyer must satisfy all the requirements found in the Commercial Code. (See *Gavaldon*, *supra*, 32 Cal.4th at pp. 1263–1264; *Ramos v. Mercedes-Benz USA, LLC* (2020) 55 Cal.App.5th 220, 227; Cal. U. Com. Code, §§ 2608, 10517.) In some instances, the facts that establish a violation of the 30-day rule might also satisfy the requirements for revocation of acceptance under the Commercial Code. However, a violation of the 30-day rule does not, in and of itself, give the buyer grounds to revoke.

Nor does section 2608 allow a buyer to revoke acceptance of a good that is free of nonconformities. Section 2608 states the buyer may revoke acceptance of a good "whose nonconformity substantially impairs its value to him." (Cal. U. Com. Code, § 2608, subd. (1).) To revoke under subdivision (1)(a)—as Anaya claims to have done here—the buyer also must show the nonconformity "has not been seasonably cured." (*Id.*, § 2608, subd. (1)(a).)[10] The use of the present tense in these provisions makes clear that the nonconformity must still exist and be impairing the good's value *at the time of revocation*. The statute

---

[10] Section 10517 uses identical language. (See Cal. U. Com. Code, § 10517, subd. (a)(1).)

21

does not allow revocation merely because the nonconformity "was not seasonably cured" or "impaired" the good's value at some point in the past.  (See 4 Anderson, U.C.C. (3d ed. 2024) § 2-608:124 ["Defects cured by the seller are to be ignored in determining whether there are nonconformities that substantially impair the value of the goods to the buyer"].)

Here, Anaya presented evidence of a single nonconformity related to the Sorento's engine.  Once KMA completed the repairs, the Sorento no longer had a nonconformity that "impairs" the Sorento's value to Anaya and "has not been seasonably cured."[11]  Accordingly, Anaya no longer had grounds to revoke acceptance of it.  (See 4 Anderson, U.C.C. (3d ed. 2024) § 2-608:128.)

Citing *Seekings v. Jimmy GMC of Tucson, Inc.*, *supra*, 130 Ariz. 596, Anaya argues the Supreme Court of Arizona found revocation of acceptance under an identical statute was timely, even though the buyer provided notice "two months after the repair attempt was completed."  Anaya fails, however, to mention the fact that the repair attempt in *Seekings* did not cure all the defects that provided the grounds for revocation.  (*Id.* at p. 599.)  Here, in contrast, the undisputed evidence shows KMA cured the

---

[11]     In the trial court, Anaya argued there was no evidence that KMA cured the engine defect.  Anaya does not meaningfully raise that issue on appeal, and for good reason.  KMA presented undisputed evidence that, as of August 28, 2018, it had replaced the Sorento's engine, starter, and manifold.  Anaya suggested below that the repairs did not cure the defect because all Sorento engines are defective.  However, he introduced no evidence from which the jury could have made that finding.

22

defect before Anaya refused to pick up the Sorento and filed his complaint. Accordingly, *Seekings* is no help to Anaya.

Nor are we persuaded by Anaya's contention that it would be "nearly impossible" for buyers to revoke acceptance if they are required to do so before the nonconformity is cured. The Commercial Code makes it very simple for a buyer to revoke acceptance; the buyer need only provide the seller notice of revocation. (See Cal. U. Com. Code, § 2608, subd. (2).) If a buyer believes he is entitled to revocation because repairs are taking too long, he can provide notice of revocation at that time.

Even if the buyer provides notice too late or is unable to revoke acceptance for some other reason, he is not left without a remedy for untimely repairs. The Song-Beverly Act allows a buyer to recover damages for delayed warranty repairs, even if the buyer did not revoke acceptance. (See §§ 1793.2, subd. (b), 1794.) Specifically, under section 1794(b)(1), a buyer who has "accepted the goods" is entitled to relief under Commercial Code sections 2714 and 2715, which includes incidental and consequential damages. (§ 1794, subd. (b)(2).)

Here, there is no question that KMA violated the 30-day rule. However, for the reasons we discussed, Anaya failed to prove he revoked acceptance of the Sorento under the Commercial Code. Therefore, his damages were limited to those recoverable under section 1794(b)(1). For whatever reason, Anaya did not present evidence of those damages at trial. Accordingly, he was not entitled to recover anything for the 30-day violation, and the trial court properly granted a directed verdict for KMA.[12]

---

[12]     We also reject any suggestion that Anaya revoked acceptance by ceasing to make payments on the lease. Although

## II. Summary adjudication

Anaya challenges the trial court's orders granting KMA's motion for summary adjudication of his claims for fraudulent concealment, fraudulent misrepresentation, and breach of the implied warranty of merchantability. He does not challenge the order summarily adjudicating his express warranty claim.

### A. Standard of review

We review orders granting summary adjudication de novo. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 (*Aguilar*).) We examine "(1) the pleadings to determine the elements of the claim, (2) the motion to determine if it establishes facts justifying judgment in the moving party's favor, and (3) the opposition—assuming movant has met its initial burden—to 'decide whether the opposing party has demonstrated the existence of a triable, material fact issue.'" (*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 630.)

Under Code of Civil Procedure section 437c, the moving party bears the initial burden of showing that a cause of action has no merit by demonstrating that one or more elements of the cause of action cannot be established or that there is a complete defense. (*Aguilar*, *supra*, 25 Cal.4th at p. 850.) The moving party

---

not entirely clear from the record, Anaya states he took out a loan at the start of the lease so he could pay off the entire amount due. If so, it would mean he stopped making payments on the loan, not on the lease itself. Therefore, it would not have constituted a notice of revocation to the seller. In any event, Anaya points to no evidence showing when he stopped making the payments. Accordingly, even if his inaction could be interpreted as a revocation of acceptance, no reasonable juror could have found it was timely.

can meet this burden by presenting evidence that negates an element of the plaintiff's case or by showing the plaintiff cannot reasonably obtain needed evidence. (*Id.* at p. 855.) Once the moving party meets this initial burden, the burden shifts to the opposing party to present evidence demonstrating a triable issue of material fact exists. (*Id.* at pp. 850–851.)

## B.    Fraud

Anaya contends the trial court erred by concluding his fraud claims are barred by the economic loss rule. According to Anaya, his claims were for fraudulent inducement of contract, which is a type of fraud claim not subject to the economic loss rule. We need not consider that issue because, even assuming Anaya is correct, KMA was entitled to summary adjudication of the fraud claims on other grounds.

### 1.    *Trial court proceedings*

In his operative complaint, Anaya alleged KMA fraudulently concealed a known defect in the Theta II engine to induce him to lease the Sorento. He alleged that KMA possessed superior knowledge about the engine's propensity for rod bearing failure and catastrophic seizure, but it failed to disclose this information to consumers. Anaya asserted he would not have leased the Sorento had he known about the defect.

Anaya also alleged KMA committed fraud by making false statements about the Theta II engine in a marketing brochure. According to Anaya, KMA's misrepresentations about the engine caused him to believe, incorrectly, that the Sorento was reliable, efficient, and had a "smooth idle." He insisted he would not have leased the vehicle if he knew the true facts about the Theta II engine.

25

KMA challenged Anaya's fraud claims in its motion for summary adjudication on several grounds, including that they are barred by the economic loss rule. With respect to the concealment claim, KMA also argued Anaya could not prove it had a duty to disclose information regarding the engine defect. According to KMA, it is undisputed that it had no direct dealings with Anaya before he leased the Sorento, which is required for a duty to disclose to arise. KMA argued the undisputed evidence also shows it did not conceal the existence of the engine defect, nor was it a matter within its exclusive knowledge. In support, KMA pointed to allegations in the complaint that KMA had publicized the engine defect by issuing technical service bulletins to its authorized repair facilities. KMA also noted the complaint alleged a federal agency received consumer complaints about the engine as early as 2012.

As to the misrepresentation claim, KMA argued the undisputed evidence shows Anaya did not rely on representations about the engine when deciding to lease the Sorento. In support, KMA submitted excerpts from Anaya's deposition testimony. Anaya testified that he saw advertisements for the Sorento in the newspaper and on television. KMA asked Anaya if there was "anything in those commercials that you relied upon about the quality of the vehicle, how it would run and how the engine would run." Anaya responded, "When I looked at them, they looked really nice." Asked if he relied on anything "other than just the looks and the style of the car," Anaya said, "Well, they were giving you good offers, zero down, pick up brand new. And so that's why I went and got one." KMA ask Anaya if he "read anything about the type of engine that was in a Kia Sorento before" leasing it. Anaya replied, "Yes, I saw it, and it looked

26

really good." KMA tried to clarify, asking if there was "anything that specifically was written about the engine that made you rely on that statement in buying the car?" Anaya replied, "That I didn't see."

The trial court summarily adjudicated the fraud claims in KMA's favor. The court concluded the economic loss rule barred both claims. The court did not consider KMA's other arguments.

### 2. *Concealment*

In moving for summary adjudication of Anaya's fraudulent concealment claim, KMA's primary argument was that it did not have a relationship or transaction with Anaya that would give rise to a duty to disclose. On appeal, KMA argues the trial court could have granted summary adjudication in its favor on this ground alone. We agree.

To establish fraudulent concealment, a plaintiff must prove: "(1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would have acted differently if the concealed or suppressed fact was known; and (5) plaintiff sustained damage as a result of the concealment or suppression of the material fact." (*Rattagan v. Uber Technologies, Inc.* (2024) 17 Cal.5th 1, 40 (*Rattagan*).)

The California Supreme Court recently stated a "duty to disclose a material fact can arise if (1) it is imposed by statute; (2) the defendant is acting as plaintiff's fiduciary or is in some other confidential relationship with the plaintiff that imposes a disclosure duty under the circumstances; (3) the material facts are known or accessible only to defendant, and defendant knows those facts are not known or reasonably discoverable by plaintiff

27

(i.e., exclusive knowledge); (4) the defendant makes representations but fails to disclose other facts that materially qualify the facts disclosed or render the disclosure misleading (i.e., partial concealment); or (5) the defendant actively conceals discovery of material fact from the plaintiff (i.e., active concealment)." (*Rattagan*, *supra*, 17 Cal.5th at p. 40.)

The high court explained that three of the circumstances giving rise to a duty to disclose—the exclusive knowledge, partial concealment, and active concealment circumstances— "presuppose a preexisting relationship between the parties, such as 'between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual agreement. [Citation.] All of these relationships are created by transactions between parties from which a duty to disclose facts material to the transaction arises under certain circumstances.' [Citation.] 'Such a transaction must necessarily arise from direct dealings between the plaintiff and the defendant; it cannot arise between the defendant and the public at large.' " (*Rattagan*, *supra*, 17 Cal.5th at p. 40, quoting *Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 312 (*Bigler-Engler*).)

*Bigler-Engler* is instructive. In that case, the court considered whether a manufacturer of a medical device committed fraud by failing to disclose to a consumer the risk of injury from using the device. (See *Bigler-Engler*, *supra*, 7 Cal.App.5th at p. 289.) The court distinguished a manufacturer's duty to disclose information to consumers for purposes of a fraud claim from its duty to warn consumers under strict liability principles. (*Id*. at p. 312.) The court explained that a duty to disclose requires some sort of transaction between the

28

manufacturer and the consumer, while a duty to warn does not. Moreover, the transaction giving rise to a duty to disclose "must necessarily arise from direct dealings between the plaintiff and the defendant; it cannot arise between the defendant and the public at large." (*Ibid*.)

The court concluded the manufacturer did not owe the plaintiff a duty to disclose because there was insufficient evidence of a transaction between them. (*Bigler-Engler*, *supra*, 7 Cal.App.5th at p. 314.) The court noted the plaintiff's doctor prescribed the device, the plaintiff rented the device from the doctor's medical group, and there was no evidence the manufacturer even knew the plaintiff was using the device. (*Ibid*.) The court also noted the manufacturer did not advertise its products to consumers or derive monetary benefit directly from the plaintiff's use of the device. (*Ibid*.)

Here, Anaya alleged KMA owed it a duty to disclose information about the Theta II engine defect before he leased the Sorento. In support of its motion for summary adjudication, KMA submitted undisputed evidence showing it did not have any direct dealings with Anaya at that time. Specifically, KMA's evidence showed Anaya leased the Sorento from the Dealership, which is independent of KMA. KMA also submitted evidence that Anaya did not communicate, directly or indirectly, with any KMA employees at any time before signing the lease. This was sufficient to show KMA did not owe Anaya a duty to disclose. (See *Bigler-Engler*, *supra*, 7 Cal.App.5th at p. 312.) Accordingly, KMA met its initial burden to show the concealment claim lacked merit, and the burden shifted to Anaya to raise triable issues of fact.

Anaya does not point to any evidence in the record showing he had direct dealings with KMA before he entered into the lease.[13]  Nevertheless, he contends he met his burden by showing KMA advertised directly to consumers.  Anaya suggests that, under *Bigler-Engler*, advertisements directed at consumers are sufficient "transactions" from which a duty to disclose can arise.

The court in *Bjoin v. J-M Manufacturing Co., Inc.* (2025) 113 Cal.App.5th 884 (*Bjoin*), recently rejected a nearly identical argument.  In that case, the plaintiffs brought a fraudulent concealment claim against a pipe manufacturer.  The plaintiffs asserted the manufacturer owed them a duty to disclose the risk of cancer from cutting its pipes.  (*Id.* at p. 890.)  The plaintiffs argued, under *Bigler-Engler*, "a duty to disclose relationship is created . . . when a manufacturer advertises its products to consumers or profits from the sale of its products to consumers." (*Id.* at p. 902.)  The Court of Appeal disagreed.  The court explained that imposing a duty to disclose under those circumstances would greatly expand the well-settled law on

---

[13]    Anaya suggests, in passing, that KMA's duty to disclose arose out of his conversations with KMA's "agents during the sales process."  Anaya does not identity those "agents." Presumably, he is referring to the Dealership employees.  If so, he cites no evidence or authority showing the salespeople were KMA's agents.  Accordingly, we consider the issue forfeited.  (See *Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655 [an appellant must present "legal authority on each point made and factual analysis, supported by appropriate citations to the material facts in the record; otherwise, the argument may be deemed forfeited"].)

30

fraudulent concealment, which the California Supreme Court recently summarized in *Rattagan*. (*Id.* at pp. 901–903.)

The *Bjoin* court acknowledged that *Bader v. Johnson & Johnson* (2022) 86 Cal.App.5th 1094 read *Bigler-Engler* to expand the law on fraudulent concealment. (*Bjoin*, *supra*, 113 Cal.App.5th at p. 903.) However, it declined to follow that case, noting it doubted the *Bigler-Engler* "court intended to greatly expand the well settled law on fraudulent concealment, . . . solely by its description of evidence that had not been offered in the case, without any supporting legal analysis or citation to legal authority, indeed without any acknowledgment that it was expanding the law. Further, in many factual circumstances, such an expansion would create the exact duty-to-disclose relationship which the *Bigler*[-*Engler*] court has expressly disavowed: a relationship between the defendant and the public at large." (*Ibid.*)

Like the plaintiffs in *Bjoin*, Anaya argues KMA's act of advertising directly to consumers constituted a sufficient "transaction" to support imposing on it a duty to disclose. We agree with the *Bjoin* court that imposing a duty to disclose under these circumstances would greatly expand the law on fraudulent concealment and contradict the Supreme Court's recent statement that a duty to disclose generally arises only when the parties have had "direct dealings." (See *Rattagan*, *supra*, 17 Cal.5th at p. 40; *Bjoin*, *supra*, 113 Cal.App.5th at pp. 901–903.) Accordingly, for the reasons the *Bjoin* court articulated, we reject Anaya's contention that he had a duty-to-disclose relationship with KMA based solely on its advertisements.[14]

---

[14] To the extent Anaya makes other arguments on this issue in his letter responding to our request for supplemental briefing

31

Anaya's reliance on *Burch v. CertainTeed Corp.* (2019) 34
Cal.App.5th 341, *Whiteley v. Philip Morris Inc.* (2004) 117
Cal.App.4th 635 and *Jones v. ConocoPhillips Co.* (2011) 198
Cal.App.4th 1187 is misplaced. The *Burch* court expressly
declined to consider whether the defendant owed the plaintiff a
duty to disclose, concluding the defendant forfeited the issue by
failing to raise it in the trial court. (*Burch*, at pp. 350–352.) The
*Whiteley* court also did not consider whether the defendant had a
duty to disclose. Instead, it considered whether there was
sufficient evidence showing the plaintiff actually and justifiably
relied on the defendant's misrepresentations and false promises.
(See *Whiteley*, at p. 678.) The *Jones* court did consider whether
the defendants owed the plaintiffs a duty to disclose. (See *Jones*,
at p. 1200.) However, it did not consider the specific argument
KMA raises here: that the parties did not have a sufficient
relationship or transaction from which a duty to disclose could
arise. Accordingly, *Jones* also is of no help to Anaya.

We also reject Anaya's argument, raised for the first time
on appeal, that a direct dealing with KMA was unnecessary
because he was a member of the "class of persons that KMA
intended to defraud, making it foreseeable that KMA's
nondisclosure would be passed on to him." In support, Anaya
cites cases in which the initial seller of property concealed
information from a buyer, who then resold the property to a

---

on *Rattagan*, *supra*, 17 Cal.5th 1, we decline to consider them.
Anaya could have made those arguments in his opening brief,
and his failure to do so forfeits the issues. (See *Nordstrom Com.
Cases* (2010) 186 Cal.App.4th 576, 583 [a reviewing court need
not consider points not raised in the appellant's opening brief].)

subsequent purchaser. The courts held the subsequent purchaser could bring a concealment claim against the initial seller if the seller intended, or had reason to expect, the concealment would be passed on to the subsequent purchaser. (See *OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 859; *Barnhouse v. City of Pinole* (1982) 133 Cal.App.3d 171, 193; *Massei v. Lettunich* (1967) 248 Cal.App.2d 68, 73; see also *Varwig v. Anderson-Behel Porsche/Audi, Inc.* (1977) 74 Cal.App.3d 578, 581; *Geernaert v. Mitchell* (1995) 31 Cal.App.4th 601, 608.)

In the cases Anaya cites, the defendant concealed information from an intermediary who "passed on" the concealment to the plaintiff. Anaya does not clearly identify what intermediary "passed on" KMA's concealment to him. As best we can tell, Anaya's theory is that KMA concealed the defect from the Dealership, and the Dealership passed it to him. If so, he cites no evidence to support his theory, and his own complaint contradicts it. Indeed, the complaint alleges that in 2012—four years before Anaya leased the Sorento—KMA issued a technical service bulletin to its authorized dealerships acknowledging that "earlier model years of similar vehicles with identical engines were defective." In other words, the complaint concedes that KMA had already disclosed the engine defect to its authorized dealerships—which would have included the Dealership—by the time Anaya leased the Sorento. Accordingly, there was no concealment for the Dealership to "pass on" to Anaya.

To the extent Anaya instead means to suggest KMA owed him a duty to disclose simply because it intended to defraud members of a class to which he belonged, we disagree. A duty to disclose and an intent to defraud are separate elements of a

33

fraudulent concealment claim. (*Rattagan*, *supra*, 17 Cal.5th at p. 40.) Anaya's suggestion—that an intent to defraud a class of persons to which the plaintiff belonged is sufficient to establish a duty to disclose—effectively would render the duty to disclose element superfluous.

Anaya contends KMA had a separate and independent duty to disclose the engine defect simply because it posed a "serious safety risk." In support, Anaya cites several decisions from federal courts applying California law. (See *Smith v. Ford Motor Co.* (N.D.Cal. 2010) 749 F.Supp.2d 980, 987–988; *Oestreicher v. Alienware Corp.* (9th Cir. 2009) 322 Fed.Appx. 489, 493; *Mui Ho v. Toyota Motor Corp.* (N.D.Cal. 2013) 931 F.Supp.2d 987 (*Mui Ho*).) In one of those cases, a federal district court stated it is a "basic rule of California law" that "a fact can give rise to a duty to disclose and an actionable omission if it implicates safety concerns that a reasonable consumer would find material." (*Mui Ho*, at p. 997.) The district court cited two California Court of Appeal decisions in support of that proposition, *Bardin v. DaimlerChrysler Corp.* (2006) 136 Cal.App.4th 1255 (*Bardin*) and *Daugherty v. American Honda Motor Co., Inc.* (2006) 144 Cal.App.4th 824 (*Daugherty*).

The court in *Gutierrez v. Carmax Auto Superstores California* (2018) 19 Cal.App.5th 1234 rejected an identical argument based on the same federal authority. The *Gutierrez* court explained that neither California case on which the federal courts relied—*Bardin* and *Daugherty*—"actually held sellers of automobiles are subject to an independent duty to disclose safety concerns. Rather, the references to safety concerns in those opinions appear in dicta." (*Id.* at p. 1259.)

34

We agree with the *Gutierrez* court's reading of *Bardin* and *Daugherty*. Moreover, the California Supreme Court recently listed the circumstances that give rise to a duty to disclose for purposes of a common law fraudulent concealment claim. (*Rattagan*, *supra*, 17 Cal.5th at p. 40.) The Supreme Court did not include within that list the existence of a serious safety risk. Accordingly, we reject Anaya's argument that KMA had a duty to disclose the alleged engine defect simply because it posed a serious safety risk.

3.    *Misrepresentation*

KMA argues it was entitled to summary adjudication of Anaya's fraudulent misrepresentation claim because Anaya produced no evidence of an affirmative misrepresentation upon which he relied. We agree.

Fraudulent inducement by intentional misrepresentation requires proof of: (1) a false representation to plaintiff; (2) knowledge it was false; (3) intent that the plaintiff rely on the misrepresentation; (4) justifiable reliance by the plaintiff; and (5) damage caused by reliance. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 974 (*Engalla*).) Reliance occurs when the misrepresentation is an immediate cause of the plaintiff's conduct and when, absent the representation, the plaintiff would not in all reasonable probability have entered the transaction. (*Id.* at pp. 976–977.)

In its motion for summary adjudication, KMA argued the undisputed evidence shows Anaya did not rely on any affirmative misrepresentations about the engine when he decided to lease the Sorento. In support, KMA pointed to Anaya's deposition testimony that his leasing decision was based on the vehicle's appearance and affordability, rather than any specific

representation about the engine's performance or reliability. This evidence satisfied KMA's initial burden to demonstrate that Anaya could not establish at least one element of the fraudulent misrepresentation claim. Accordingly, the burden shifted to Anaya to proffer evidence of triable issues of material fact.

Anaya asserts he met his burden by submitting evidence showing he relied on advertisements that "included representations regarding the engine and the service he would receive for the vehicle." He fails, however, to identify a single misrepresentation KMA made about the engine, let alone a misrepresentation upon which he relied. On the record before us, no reasonable trier of fact could conclude Anaya relied on a misrepresentation concerning the Sorento's engine, as alleged in his complaint. Accordingly, Anaya failed to meet his burden, and the trial court properly granted KMA's motion for summary adjudication of this claim. (See *Engalla*, *supra*, 15 Cal.4th at pp. 976–977.)[15]

### C.    Breach of implied warranty

Anaya contends the trial court erred by granting summary adjudication for KMA on his breach of implied warranty claim. According to Anaya, KMA owed him an implied warranty under section 1795, which imposes implied warranty obligations on

---

[15]    After disposing of the fraud claims, the trial court ruled Anaya could not pursue punitive damages because there remained no viable claim to support such an award. Because we conclude the trial court properly granted summary adjudication of both fraud claims, we also conclude it properly determined Anaya was not entitled to punitive damages.

distributors that provide express warranties. We decline to consider Anaya's argument because he failed to raise it below.[16]

Anaya alleged in his complaint the sale of the Sorento "was accompanied by an implied warranty that the [Sorento] was merchantable pursuant to Civil Code section 1792." Section 1792 provides: "[E]very sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable."

In its motion for summary adjudication, KMA argued it did not have an implied warranty obligation under section 1792 because it was neither the "retail seller" nor "manufacturer" of the Sorento. According to KMA, it was the "distributor." In support, KMA submitted a declaration from Mandyjay Lewis stating it is a "distributor of new motor vehicles, which stands between the retail seller and the manufacturer."

Anaya devoted two paragraphs of his opposition to the implied warranty claim. He argued the "Song-Beverly Act is not clear as to whether its implied warranty provision applies to distributors." Anaya urged the court to interpret section 1792 to apply to distributors, otherwise "no implied warranties could ever be enforced against the domestic entity of a foreign car manufacturer." Alternatively, he argued Lewis's declaration was insufficient to show KMA is a distributor, rather than a retail seller or manufacturer.

---

[16] Because we do not consider Anaya's argument on the merits, we need not consider KMA's arguments concerning the duration of any implied warranty. Therefore, we deny KMA's motion for judicial notice of legislative history relevant to that issue.

37

The court rejected Anaya's arguments and granted summary adjudication for KMA.  The court concluded the plain language of section 1792 imposes implied warranty obligations only on manufacturers and retail sellers.  It also found KMA presented undisputed evidence that it is a distributor.

On appeal, Anaya argues the trial court erred in granting summary adjudication of his implied warranty claim.  However, he has abandoned the arguments he made in the trial court, including his argument that section 1792 applies to distributors.  Anaya instead argues KMA was obligated to provide an implied warranty because it provided an express warranty.  In support, he cites section 1795, which states:  "If express warranties are made by persons other than the manufacturer of the goods, the obligation of the person making such warranties shall be the same as that imposed on the manufacturer under this chapter."

" ' "Generally, the rules relating to the scope of appellate review apply to appellate review of summary judgments" ' " and adjudications.  (*San Francisco Print Media Co. v. The Hearst Corp.* (2020) 44 Cal.App.5th 952, 965.)  One of those general rules is that " 'theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried.' "  (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 997 (*Nellie*).)  Another general rule is that appellate courts "ignore arguments, authority, and facts not presented and litigated in the trial court."  (*Bialo v. Western Mutual Ins. Co.* (2002) 95 Cal.App.4th 68, 73 (*Bialo*).)

These rules are "rooted in the notion that it is unfair to the trial judge and the adverse party" to raise new issues and theories on appeal.  (*Glassman v. Safeco Ins. Co. of America*

(2023) 90 Cal.App.5th 1281, 1326; see *JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 178 (*JRS Products*) ["fairness is at the heart of a waiver claim"]; *Ernst v. Searle* (1933) 218 Cal. 233, 240–241 [allowing a party to advance a new theory on appeal "would not only be unfair to the trial court, but manifestly unjust to the opposing litigant"].) Moreover, allowing parties to raise new theories or issues on appeal would "wreak[] havoc on a judicial system too burdened to retry cases on theories that could have been raised earlier." (*JRS Products*, at p. 178.) Therefore, "[a]ppellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider." (*Ibid.*)

These general forfeiture rules apply to Anaya's argument—raised for the first time on appeal—that KMA's implied warranty obligation arose under section 1795. Anaya did not mention section 1795 in his complaint. Instead, he alleged only that there is an implied warranty "pursuant to Civil Code section 1792." In its motion for summary adjudication, KMA correctly pointed out that section 1792 does not expressly apply to distributors, like itself. In opposition, Anaya could have clarified that KMA's implied warranty obligation arose under section 1795, rather than directly under section 1792. Instead, he advanced two arguments he now implicitly concedes lacked merit. The trial court was right to reject both.

Anaya criticizes the trial court for "apparently overlooking" section 1795 when it granted summary adjudication for KMA. However, the trial court was not required to make arguments for Anaya or search for statutes that might support his claim. The onus was on Anaya to bring section 1795 to the court's attention.

39

(See *JRS Products*, *supra*, 115 Cal.App.4th at p. 178 ["In our adversarial system, each party has the obligation to raise any issue or infirmity that might subject the ensuing judgment to attack"].) His failure to do so forfeits the issue on appeal. (See *Nellie*, *supra*, 4 Cal.App.5th at p. 997; *Bialo*, *supra*, 95 Cal.App.4th at p. 73.)

Even if we had discretion to overlook Anaya's forfeiture, we would decline to exercise it. (See *Ramirez v. Department of Motor Vehicles* (2023) 88 Cal.App.5th 1313, 1335 [appellate courts retain discretion to consider new issues that raise pure questions of law based on undisputed facts].) Assuming Anaya's section 1795 argument has merit, there is no reason to suspect the trial court would have rejected it. Therefore, had Anaya raised the issue below, he could have tried the implied warranty claim alongside his other Song-Beverly Act claim. In fact, Anaya likely could have relied on much of the same evidence to prove both claims. However, because Anaya waited until appeal to raise the issue, granting him relief would require a completely new trial. A new trial would place a substantial burden on the trial court, the witnesses, KMA, and the members of the public asked to serve on the jury. Those burdens could have been avoided had Anaya simply identified the statutory basis for his claim in the trial court. Under these circumstances, we decline to exercise any discretion we might have to overlook Anaya's forfeiture. Because Anaya does not make any other arguments concerning

his implied warranty claim, we affirm the trial court's order granting summary adjudication for KMA.[17]

## DISPOSITION

We affirm the judgment.  KMA is awarded its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.


I concur:



EDMON, P. J.

---

[17] Anaya argues the trial court's costs award must be reversed to the extent we reverse the judgment.  Because we affirm the judgment, we reject his argument as to costs.

**KLATCHKO, J., Concurring and Dissenting:**

I concur in the opinion, except for Part II(C), from which I respectfully dissent, as I would hold that under the Song-Beverly Act a distributor or other nonmanufacturer issuing an express warranty assumes the obligations of a "manufacturer" under section 1792, and is deemed to have impliedly warranted the merchantability of any product or part it expressly warrants. Because it is undisputed that KMA issued an express warranty, I would find that it impliedly warranted the merchantability of Anaya's vehicle. I would also find that Anaya did not waive or abandon this argument.

The Legislature enacted the Song-Beverly Act because Commercial Code warranties proved "limited in providing effective recourse to a consumer dissatisfied with a purchase." (*Krieger v. Nick Alexander Imports, Inc.* (1991) 234 Cal.App.3d 205, 213.) The Act "is strongly pro-consumer" and provides remedies "in addition to those available . . . pursuant to the [Uniform] Commercial Code." (*Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 990.) In furtherance of this purpose, the Act imposes on "manufacturers" and "retail sellers" implied warranty obligations that may not be disclaimed or superseded by an express warranty, unlike the implied warranty obligations imposed on these parties under the Commercial Code. (*Mocek v. Alfa Leisure, Inc.* (2003) 114 Cal.App.4th 402, 409 (*Mocek*).)

Under the Act every retail sale of consumer goods in California includes an implied warranty by the "manufacturer" and "retail seller" that the goods are "merchantable" unless expressly

1

sold "as is." (Civ. Code, §§ 1791.3, 1792.)[1] Merchantability generally means that goods are "fit for the ordinary purposes for which such goods are used" and "in safe condition and substantially free of defects." (*Mexia v. Rinker Boat Co., Inc.* (2009) 174 Cal.App.4th 1297, 1303–1304.)

Unlike with an express warranty, consumers need not wait until a manufacturer or retail seller has had an opportunity to make repairs before seeking to enforce an implied warranty of merchantability "[b]ecause the defects involved in an implied warranty of merchantability are so fundamental . . . ." (*Carver v. Volkswagen Group of America, Inc.* (2024) 107 Cal.App.5th 864, 878, citing *Brand v. Hyundai Motor America* (2014) 226 Cal.App.4th 1538, 1548.) Additionally, where there is a breach of the implied warranty of merchantability, consumers may revoke acceptance of goods and recover what they have paid. (*Carver*, at pp. 878–879.)

The Act's enhanced implied warranty obligations are key to its pro-consumer scheme. Section 1792 provides: "Unless disclaimed in the manner prescribed by this chapter, every sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable." This provision specifically identifies the parties subject to implied warranty obligations as "manufacturers" and "retail sellers," defined in section 1791, subdivisions (j) and (*l*). It does not expressly include "distributors," defined in section 1791, subdivision (e), as "any indi-

---

[1]     All further undesignated statutory references are to the Civil Code.

2

vidual, partnership, corporation, association, or other legal relationship that stands between the manufacturer and the retail seller in purchases, consignments, or contracts for sale of consumer goods."

The Act's system of warranty obligations carefully distinguishes among manufacturers, distributors, and retail sellers based on their different roles in the distribution chain. KMA argued below that by establishing a comprehensive statutory scheme with clearly delineated roles distinguishing among "manufacturers," "retail sellers," and "distributors," the Legislature's failure to include "distributors" in section 1792 must have been intentional. It argued: "Nothing in the chapter creates, by virtue and operation of law, an implied warranty of merchantability for KMA." That is, section 1792 should be read in context of the whole Act, and by negative implication or the principle of *expressio unius est exclusio alterius*, should be interpreted as excluding "distributors."[2] KMA's sole basis for summary judgment or adjudication of the second cause of action for breach of implied warranty was that KMA was not a "manufacturer."

The trial court found this reasoning persuasive, concluding that KMA is a distributor and "the Song-Beverly Act clearly indicates that the implied warranty of merchantability provided in

---

[2]     KMA did not pursue this argument on appeal but maintains that it also did not abandon or concede it. I disagree and would treat KMA's failure to meaningfully brief or address this argument on appeal as a concession. Further, I would reject out of hand KMA's argument, raised for the first time on appeal, that any applicable warranty expired before Anaya made a claim. That argument was not directly or by implication before the trial court and it does not concern a purely legal issue.

3

Section 1792 applies only to 'the manufacturer' and 'the retail seller.' "

Anaya argues on appeal that section 1795 renders KMA's status as a "distributor" immaterial. Section 1795 provides: "If express warranties are made by persons other than the manufacturer of the goods, the obligation of the person making such warranties shall be the same as that imposed on the manufacturer under this chapter." (§ 1795.)

Anaya did not specifically address section 1795 below. Instead, Anaya argued that the Act was "not clear as to whether its implied warranty provision applies to distributors." He argued that KMA's interpretation of section 1792 would render superfluous the word "distributor" in section 1793, which states in pertinent part: "a manufacturer, distributor, or retailer, in transacting a sale in which express warranties are given, may not limit, modify, or disclaim the implied warranties guaranteed by this chapter to the sale of consumer goods." (§ 1793.)

It is not unreasonable for the majority to conclude that Anaya should have raised and briefed section 1795 below. But the essential issue before the trial court was whether a distributor may be liable under section 1792 for breach of the warranty of merchantability implied in every sale of consumer goods. This same issue is before us on appeal. Unlike the majority, I would not find that Anaya abandoned this issue, or raised a wholly new issue, by focusing on section 1795. Aside from the fact that we may consider purely legal issues like statutory interpretation for the first time on appeal (*Hale v. Morgan* (1978) 22 Cal.3d 388, 394), section 1795 is not a "new" basis for implied warranty liability, as suggested by the majority. Instead, as pertinent to the case at bench, section 1795 addresses the circumstances under which

4

a nonmanufacturer like KMA may be deemed by operation of law to fall within the definition of "manufacturer" under section 1792, i.e., share the same obligation imposed on the manufacturer.

Section 1795 applies to "persons other than the manufacturer of the goods." It is conditional, expanding implied warranty obligations only to "persons other than the manufacturer of the goods" who elect to issue express warranties. "Persons" is not defined in the Act. Giving the term its plain and ordinary meaning in context (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737, it pertains to any party issuing an express warranty, other than the "manufacturer."

These "persons" assume the same obligations "as [those] imposed on the manufacturer under this chapter." The "chapter" at issue is "Chapter 1. Consumer Warranty Protection," of Title 1.7, "Consumer Warranties," encompassing sections 1790 through 1795.8. A plain reading of section 1795 is that "chapter" includes all the Act's consumer warranty provisions, including section 1792.

This reading is consistent with the only published case analyzing section 1795, *Mega RV Corp. v. HWH Corp.* (2014) 225 Cal.App.4th 1318. In *Mega RV*, a retail seller of recreational vehicles sought indemnity from a component-part manufacturer, arguing that it was a "manufacturer" under section 1792. (*Mega RV*, at p. 1322.) The court concluded that a component-part manufacturer was not a "manufacturer" for purposes of the Act and would only be subject to implied warranty obligations under section 1792 if it provided an express warranty to the consumer pertaining to the component part at issue. (*Mega RV*, at p. 1323.) It based its conclusion on the language of section 1795, explaining that issuing an express warranty created an implied warranty

obligation: "By requiring an implied warranty of merchantability to accompany any express warranties, the Act ensures that retail buyers in receipt of an express warranty have a minimum level of substantive protection. . . . Unlike the manufacturer who ships the completed good to the retail seller, a component-part manufacturer may not be in a position to craft an express warranty or disclaim an implied warranty. [¶] But what if a component-part manufacturer provides an express warranty to the consumer? Is such an express warranty governed by the Act? Section 1795 answers this question in the affirmative, even assuming a component-part manufacturer is not a 'manufacturer' under the Act . . . ." (*Mega RV*, at pp. 1331–1332, fn. omitted.) The court went on to explain that the scope of the implied warranty under these circumstances would be limited to the component part covered by the express warranty. (*Id.* at p. 1335.)

I agree with the logic of *Mega RV*. I would hold that the definition of "manufacturer" in section 1792 includes a nonmanufacturer issuing an express warranty and extends to all manufacturer obligations under "Chapter 1. Consumer Warranty Protection." This interpretation harmonizes sections 1792 and 1795, giving effect to both statutes. (*See Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 986.) It is also consistent with the Act's consumer-focused remedial purpose. (See *Niedermeier v. FCA US LLC* (2024) 15 Cal.5th 792, 804 [the Act is " ' "manifestly a remedial measure, intended for the protection of the consumer; it should be given a construction calculated to bring its benefits into action" ' "]; *Mocek, supra*, 114 Cal.App.4th at p. 409.) As this expanded definition of "manufacturer" is only triggered by issuance of an express warranty, it is not inconsistent with section 1793.

Because KMA's "distributor" status was the sole basis for the trial court's conclusion that KMA was entitled to summary judgment or adjudication of the second cause of action for breach of implied warranty, I would reverse. It is undisputed that KMA issued the express warranty at issue in this case. By issuing that warranty, KMA brought itself within the definition of "manufacturer" for purposes of section 1792 and impliedly warranted that Anaya's Kia Sorento was merchantable.


KLATCHKO, J.*

---

\*      Judge of the Riverside County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.